**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COMFORTEX COMPANY, LTD, <br><br> Plaintiff, <br><br> -against- <br><br> XCEL BRANDS, INC., H HERITAGE LICENSING, LLC and XCEL DESIGN GROUP, LLC, <br><br> Defendants. | Civil Action No.: 1:21-cv-7326 <br><br> COMPLAINT <br><br> JURY TRIAL DEMANDED |

Plaintiff Comfortex Company, Ltd. ("Comfortex"), by its undersigned attorneys, as and for its complaint against Xcel Brands, Inc. ("Xcel") and its wholly owned subsidiaries H Heritage Licensing, LLC ("HHL") and Xcel Design Group, LLC ("Xcel Design", and together with Xcel and HHL, the "Defendants"), alleges on the basis of information and belief as to all matters other than those specific matters alleged on the basis of knowledge, as follows.

## NATURE OF THE ACTION

1. Comfortex brings this action to set aside fraudulent transfers designed to frustrate efforts to collect amounts owed for goods manufactured by Comfortex.

2. At all relevant times, HOC was an alter ego of HOH and its affiliates Halston Company IP, LLC ("HIP") and HH House, LLC ("HHH" and together with HOC, HOH, and HIP, the "Halston Companies").

3. During the period September 2017 to January 2018, Comfortex manufactured garments for, and delivered garments for the benefit of, Halston

Operating Company, LLC ("HOC"), a wholly owned subsidiary of House of Halston, LLC ("HOH"). HOC never paid Comfortex in full for these garments. On May 14, 2020, the United States District Court for the Central District of California entered a default judgment in favor of Comfortex and against HOC, HOH, and HHH in the total amount of $359,882.64 (the "Money Judgment").

4.      During the course of post-judgment discovery, Comfortex learned for the first time that beginning on or around September 2017, Defendants and the executives of the Halston Companies developed a scheme by which they transferred the cash proceeds generated from the sale of garments produced by Comfortex and other vendors from HOC to Xcel, without ever paying Comfortex and other vendors of HOC. The scheme hinged on the artifice of a supposed "oral agreement," the terms of which remain subject to dispute.

5.      Comfortex has learned that by the terms of the "oral agreement," Xcel purported to license to HOC the right to use of the 'H Halston' and 'Halston Heritage' labels for sale and distribution of garments to garment retailers and department stores, including Hudson's Bay Company ("HBC") and Dillards. The 'H Halston' and 'Halston Heritage' labels are diffusion labels[1] of the 'Halston' and 'Halston Heritage' trademarks owned by HIP.

6.      This purported "oral agreement" provided to Xcel a mechanism of power and domination over the Halston Companies. Xcel used this power of domination and control to transfer from HOC to Xcel the cash proceeds generated

---

[1] According to Robert D'Loren, CEO of Xcel, a diffusion label is "a label for the tier of distribution below the primary tier."

from the sale of garments while HOC failed to pay or paid slowly Comfortex and other vendors of HOC who had manufactured garments the sales of which had generated some of the proceeds ultimately transferred to Xcel.

7. Under the guise of "approval rights" granted to Xcel by the "oral agreement," Xcel placed Seth Burroughs, a senior executive of Xcel, in the offices of the Halston Companies on a regular and systematic basis. While in the offices of the Halston Companies, Mr. Burroughs directed the actions of the Halston Companies, including causing HOC to transfer to Xcel and Xcel Design approximately $2.1 million during the period July 1, 2017 to September 18, 2018.

8. The effect of the scheme was to put Xcel at the front of the line by prioritizing transfers to Xcel over payments owed to other vendors. As a result of Xcel's extraction of funds from HOC, all of the Halston Companies became insolvent no later than June 2018.

9. By no later than June 2018, Xcel and Xcel Design had actual knowledge of the insolvency of the Halston Companies. Notwithstanding this knowledge, during the period June 2018 through September 2018 Xcel caused HOC to transfer to itself another $700,000 of cash from HOC's bank account. Then, after it had taken possession of HOC's cash, in October, 2018 Xcel used its dominion and control over the Halston Companies to obtain rights to transfer the labels 'Halston' and 'Halston Heritage' to an entity that would ultimately become HHL.

10. which were the only remaining assets of the Halston Companies with any substantial value.

11.     The 'Halston' and 'Halston Heritage' labels had a fair value of $21 million and were the only remaining assets of the Halston Companies with any substantial value. But Xcel used its domination and control over the Halston Companies to strike a deal to pay only $8.4 million in cash and 777,778 shares of Xcel's common stock valued at $1.1 million – approximately one half of the fair value of the labels.

12.     On December 11, 2018, HOC executed an assignment for the benefit of creditors. As of the date of this Complaint liquidation of the assets assigned by HOC has generated no recovery for unsecured creditors of HOC, and the assignee expects no future recovery for creditors such as Comfortex as a result of HOC's assignment for benefit of creditors.

13.     Had the Halston Companies retained the proceeds transferred to Xcel and Xcel Design under the guise of "license" and/or "design" fees, HOH or HOC would have had sufficient funds to pay Comfortex in full.

14.     Had the Halston Companies received fair value for the 'Halston' and 'Halston Heritage' labels transferred to HHL, HOH or HOC would have had sufficient funds to pay Comfortex in Full.

15.     The foregoing transfers operated as a fraudulent transfer upon Comfortex.

16.     As of the date of this Complaint, the Money Judgment remains unsatisfied. Upon information and belief, Xcel and Xcel Design continue to remain in possession of the funds extracted from HOC and HHL continues to remain in

possession of the 'Halston' and 'Halston Heritage' labels transferred from the Halston Companies.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and Defendant. This Court has ancillary jurisdiction to enforce the Money Judgment.

18. Venue is proper in this district in accordance with 28 U.S.C. 1391(b)(1) because all Defendants maintain their principal place of business and are subject to personal jurisdiction in this judicial district.

## PARTIES

19. Plaintiff Comfortex is a limited company organized and existing under the laws of the Hong Kong Special Administrative Region of the People's Republic of China.

20. Defendant Xcel is a corporation organized and existing under the laws of Delaware. Xcel maintains its principal place of business in New York County, New York.

21. Defendant HHL is a limited liability company organized and existing under the laws of Delaware. HHL is a wholly-owned subsidiary of Xcel and, upon information and belief, holds title to the 'Halston' and 'Halston Heritage' trademarks transferred from the Halston Companies. HHL maintains its principal place of business in New York County, New York.

22. Defendant Xcel Design is a limited liability company organized and existing under the laws of Delaware. Xcel Design is a wholly-owned subsidiary of Xcel. Xcel Design maintains its principal place of business in New York County, New York. Upon information and belief, Xcel Design received the approximately $2.1 million of funds transferred from HOC during the relevant time period.

## FACTUAL BACKGROUND

### Xcel's Acquisition of Diffusion Labels From the Halston Companies

23. In December 2014, Xcel acquired the 'H by Halston' and 'H Halston' diffusion labels from HIP.

24. In exchange for the 'H Halston' and 'H by Halston' labels, Xcel paid consideration including 1,000,000 shares of Xcel stock.

25. The transaction was more than a mere acquisition of intellectual property. It was a business combination. In connection with the acquisition, Ben Malka, the CEO of the Halston Companies, became a Director of Xcel. During the relevant period, Malka served in the dual capacity of CEO of the Halston Companies and Director of Xcel. During this period, Malka was expected to, and did, use his connections in the industry to solicit clients for Xcel, including department stores HBC and Dillard's.[2] Xcel separately compensated Malka for revenue generated by Dillards.

---

[2] HBC owns and operates retail department stores in Canada under the name "Hudson's Bay Company" and, until November 2019, in the United States under the name "Lord & Taylor." Dillard's owns and operates retail department stores in the United States.

26. Using Malka's connections, Xcel entered into agreements with HBC and Dillard's regarding the sale of garments bearing the 'H Halston' and 'H by Halston' labels acquired from the Halston Companies and the 'IMNYC' and 'Highline' labels previously owned by Xcel (altogether, the "Xcel Labels").

27. HBC and Dillard's were more than mere licensees of Xcel's trademarks. Xcel controlled every aspect of the design, sourcing, production, pricing, importation, and distribution of garments bearing the Xcel Labels.

28. Xcel design team employees, like Salvatore Trinidad, managed and controlled the design of each garment bearing the Xcel Labels.

29. Xcel employees such as Tracey Powell, Cynthia Allen and Cynthia Torres, controlled all aspects of the "merchandizing" of garments bearing the Xcel-owned brands, which includes the selection of styles to include in each seasonal line of garments and the pricing of those garments to the retailers.

30. Xcel employees such as Alice Wong and Kimberly Nguyen chose factories, including Plaintiff, as vendors for Xcel, negotiated factory pricing, and managed the production, export and distribution of the garments direct to the showroom floors of HBC and Dillard's retail locations.

31. Xcel's compensation for these services was nominally based on a royalty "license" fee, derived from revenue generated from sales of garments bearing the Xcel Labels, and also a "design" fee for the design and production services provided by Xcel's employees.

32. Although denominated as a "license" fee and "design" fee, in reality Xcel set all prices for the garments, including the production, wholesale and retail prices, Xcel controlled which factories produced which garments, and Xcel received an agreed upon percentage of retail sales of these garments.

### Xcel's Scheme to Fraudulently Transfer Assets
### from the Halston Companies

33. Xcel's clients such as HBC and Dillard's often slow-paid Xcel.

34. In and around September 2017, Malka and Robert D'Loren and Seth Burroughs – the CEO and SVP of Xcel, respectively – created a scheme that would result in Xcel being paid first at the expense of creditors of the Halston Companies like Comfortex.

35. The basic elements of the scheme was to establish dominion and control over the Halston Companies through the "oral agreement." Then Xcel would re-route revenue from HBC and Dillard's through HOC. This would allow Xcel to take advantage of HOC's line of credit with the factor Rosenthal & Rosenthal ("Rosenthal").

36. Ordinarily, HOC would borrow funds from Rosenthal pursuant to a line of credit secured by the garments manufactured by vendors such as Comfortex and proceeds generated from sales of those garments. HOC would then use the proceeds of the line of credit to pay Comfortex or other vendors on customary terms. Proceeds from sales of the garments would then be used to repay Rosenthal.

37. Under Xcel's scheme, Xcel would re-route to HOC cash flow from garments sales through HBC and Dillards. Once HOC had realized proceeds, either from garment sales or its line-of-credit, Xcel would then cause HOC to transfer that cash to Xcel in the form of "license" and "design" fees. HOC's cash flow from the sale of garments included cash proceeds generated by sales of the garments manufactured by Comfortex. But, Xcel caused HOC to slow- and non-pay Comfortex. Thus, transfers to Xcel would be prioritized over payments to vendors such as Comfortex.

38. In order to accomplish the scheme, D'Loren, Burroughs and Malka created the "oral agreement" between Xcel and HOC. Nominally, the "oral agreement" granted to HOC a license to manufacture garments bearing the Xcel Labels for sale to HBC and Dillard's. The terms also provided to Xcel the right to exercise "approval" rights over HOC and to provide "design" services.

39. Under the guise of its "control" rights and the provision of "design" services, Xcel dominated the Halston Companies. Burroughs, who acted on behalf of Xcel, travelled to the Halston Companies' offices in Los Angeles on a semi-monthly basis to direct and control the affairs of HOC and the other Halston Companies. Malka, who served in the dual capacity as a Director of Xcel and the CEO of the Halston Companies, acceded to the terms dictated by Xcel and acted in concert with Burroughs and D'Loren.

40. Xcel also exercised control over the Halston Companies through Cynthia Allen, Tracey Powell and Stephanie Lee, who were actually agents of Xcel during the relevant period but claimed to have been employees of HOC.

41. In reality, Allen, Powell and Lee continued to work at Xcel's offices as integrated members of Xcel's team throughout the period and continued to control all aspects of the design, production, and distribution of garments bearing the Xcel Labels. Allen, Powell and Lee continued to occupy the same desks in Xcel's offices in New York, perform the same tasks, and report to their superiors at Xcel, which controlled all aspects of the design, production, importation, pricing and distribution of garments bearing the Xcel Labels.

42. Xcel employees continued to negotiate prices with factories and managed production. All dealings with factories with respect to the Xcel Labels continued to be managed entirely through Xcel's "product lifecycle management" ("PLM") software system. HOC never even had access to Xcel's PLM system.

43. In exchange for the aforementioned license and design services, Xcel would be paid a "license" fee and "design" fee. In reality, these fees were merely a front for the transfer of HOC's cash to Xcel.

44. Once Xcel gained control over the Halston Companies, Xcel re-routed through HOC the cash flow from its clients HBC and Dillards. This cash flow was then used as collateral with which HOC could obtain further trade financing from its factors, Rosenthal. Xcel then used its domination over the Halston Companies to

prioritize payments to Xcel, under the guise of "license" and "design" fees, over payments to vendors, such as Comfortex.

45. A written version of the "oral license agreement" was never executed by Xcel or any of the Halston Companies. Instead, during the relevant period, Xcel simply dictated new and materially altered terms according to Xcel's self-interest.

46. During the period September 2017 to May 2018, Xcel caused HOC to transfer to Xcel approximately $1.4 million in cash. These transfers rendered HOC and each of the other Halston Companies insolvent by no later than June 2018.

47. Xcel knew of the insolvency of the Halston Companies because D'Loren sent Burroughs to the offices of the Halston Companies to review and analyze in person the books and records of the Halston Companies.

48. The primary reason for the insolvency of HOH and HOC were the transfers of substantial funds to Xcel under the guise of "license" and "design" fees. Meanwhile, HOC owed substantial sums to Comfortex, which remained unpaid.

49. Following Burroughs' review of the books, and Xcel's actual and/or constructive knowledge of HOC's insolvency, Xcel caused HOC to transfer to Xcel Design another $700,000 in cash.

50. If HOC had retained the cash proceeds transferred to Xcel, HOC could have paid Comfortex in full for the amounts owed to it.

51. By September 2018, Xcel had extracted the remaining cash in HOC's accounts. With knowledge that the Halston Companies were insolvent, and could not continue operations, in October 2018 Xcel caused HOH and HIP to enter into a

letter of intent by which Xcel obtained the rights to acquire the Halston Companies' most valuable assets, the 'Halston' and 'Halston Heritage' labels, for consideration valued in aggregate at approximately $11 million.

52. The fair value of the 'Halston' and 'Halston Heritage' labels was approximately $21 million. If HOH and HIP had realized the fair value of this intellectual property, the Halston Companies would have had sufficient funds to pay in full the amounts owed to Comfortex.

53. The letter of intent was binding as against HOH and HIP but provided Xcel substantial termination rights.

54. Malka then organized a vote by HOH to cause HOC to enter into an assignment for the benefit of creditors.

55. Shortly before HOC's assignment for benefit of creditors, HOH and HIP terminated intercompany license agreements with HOC. Malka was not independent of Xcel because not only was he a director of Xcel, but he received separate compensation from Xcel in connection with the relationships that he facilitated between Xcel and HBC and Dillard's.

56. On December 11, 2018, HOC executed an assignment for the benefit of creditors. When HOC ceased operations on a Friday in December 2018, Xcel "rehired" Allen the next Monday with the same pay and same duties and responsibilities, as if nothing had changed. Allen's "employment" with HOC was a façade.

57. Xcel then proceeded to complete the fraudulent transfer of the 'Halston' and 'Halston Heritage' labels from HOH and HIP to Xcel Design.

58. The following facts were presented to the Board of Directors of Xcel in a slide deck dated in December 2018:

   a. Xcel proposed to purchase the 'Halston' and 'Halston Heritage' labels for $9M.

   b. The purchase price would be paid as follows: $7.3M to refinance existing debt of Halston secured by the 'Halston' and 'Halston Heritage' labels, $840k worth of Xcel Stock, and ~$1.5M in cash from Xcel.

   c. The 'Halston' and 'Halston Heritage' labels were fairly valued by a firm retained by the Board at between $17M and $29M, with a mid-range value of $21.6M.

   d. Xcel was aware of Halston's insolvency.

   e. Xcel was aware that certain creditors of Halston might claim fraudulent transfer.

59. On February 11, 2019, Xcel entered into an asset purchase agreement (the "Heritage Asset Purchase Agreement") with HIP and HOH, pursuant to which the Xcel acquired the 'Halston,' 'Halston Heritage' and 'Roy Frowick' labels (collectively, the "Halston Labels") and other intellectual property rights belonging to HOH and HIP.

60. In accordance with the Heritage Asset Purchase Agreement, Xcel was to deliver in escrow for HIP or its designees an aggregate of $8.4 million in cash and 777,778 shares of Xcel's common stock valued at $1.1 million, subject to certain contingencies.

61. In reality, the stock portion of the consideration for the 'Halston' and 'Halston Heritage' labels was held by Xcel as "security" for any fraudulent transfer claims made against Xcel as a result of the purchase. In addition, the shares of stock provided to the Halston Companies in connection with the 2014 acquisition of the 'H Halston' and 'H by Halston' diffusion labels was also transferred to Xcel as "security" for potential fraudulent transfer claims.

62. Xcel even concocted a scheme to retain the cash portion of the purchase price. The bulk of the cash consideration was paid by merely rolling over the debt secured by the 'Halston' and 'Halston Heritage' labels with HIP's existing lender.

63. The remaining portion of the cash consideration, $1.5 million, was paid not to HIP but to Xcel as follows:

   a. Xcel and HOH agreed that HOC owed $1.5M to Xcel for unpaid "design" fees (the "Account Receivable");

   b. Xcel agreed to assign to HOH the Account Receivable; and

   c. HOH agreed to apply to Xcel's cash consideration obligation under the Heritage Asset Purchase Agreement a credit equal to the face value of the Account Receivable, i.e., $1.5 million, effective as of February 11, 2019.

64. At all relevant times, HOC's books and records failed to reflect any account receivable owed by Xcel in the amount of $1.5 million.

65. Moreover, at the time of the "assignment" of the Account Receivable from Xcel to HOH, HOC already had executed an assignment for the benefit of creditors, which was expected to generate no funds for the payment of unsecured creditors, and Xcel had failed to submit a claim to the assignee for the Account Receivable. Therefore, the value of the Account Receivable was zero at the time of the closing of the Heritage Asset Purchase Agreement.

## COUNT I

### Constructive Fraudulent Conveyance

66. Plaintiff repeats, restates, and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

67. Under New York law, a constructively fraudulent conveyance is one "made without 'fair consideration,' where '(i) the transferor is insolvent or will be rendered insolvent by the transfer in question; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital; or (iii) the transferor believes that it will incur debt beyond its ability to pay.'" *Knopf v. Phillips*, 802 Fed. Appx. 639, 642-3, *quoting Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2d Cir. 2005).

68. Here, the transfer of cash from HOC's accounts to Xcel and Xcel Design under the guise of "license" and "design" fees was made without fair consideration and rendered HOC and HOH insolvent and unable to pay Comfortex, despite the transfer of valuable assets out of HOC's accounts.

69. In addition, the transfer of the Halston Labels from HIP and HOH to HHL was made without fair consideration and rendered HOH insolvent and unable to pay its creditors, despite transferring a valuable asset.

70. As a direct consequence of the fraudulent transfers, neither HOC nor HOH have assets sufficient to pay the Money Judgment.

## COUNT II

### Actual Fraudulent Conveyance

71. Plaintiff repeats, restates, and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

72. The Defendants each acted with actual intent to defraud creditors of HOH and HOC such as Comfortex.

73. Mr. Malka, who was the Chief Executive Officer of HOH and HOC, and also a Director of Xcel, was aware of the debts owed to vendors like Comfortex at the time funds were transferred from HOC to Xcel and Xcel Design under the guise of "license" and "design" fees.

74. By no later than July 2018, Xcel and Xcel Design (through at least D'Loren, Burroughs) and HOC (through at least Mr. Malka) had actual knowledge that HOC was insolvent and unable to pay Comfortex.

75. With actual knowledge, Xcel, in concert with Mr. Malka, caused, authorized, permitted, and/or acceded to the transfer to Xcel and Xcel Design from HOC's account the amount of at least $700,000 under the guise of "license" and "design" fees.

76. At the time HOH and HIP entered into the binding letter of intent with Xcel for the Halston Labels, Xcel (through at least D'Loren and Burroughs) and HOH (through at least Mr. Malka) had actual knowledge that the fair value of the Halston Labels was approximately $21 million and that the amount agreed to by Xcel was less than fair value.

77. The knowledge of Xcel is imputed to HHL because HHL was formed as a wholly-owned subsidiary of Xcel for the specific purpose of receiving the Halston Labels.

78. "An actually fraudulent conveyance . . . is one made with actual intent to defraud, regardless of the adequacy of consideration given." *Knopf v. Phillips*, 802 Fed. Appx. At 643, *quoting In re Sharp Int'l Corp.*, 403 F.3d at 56.

79. The foregoing transfers were made with actual intent to defraud creditors including Comfortex.

## COUNT III

## Alter Ego

80. Plaintiff repeats, restates, and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

81. Xcel is jointly and severally liable for any and all damages resulting from the wrongdoing and/or unlawful conduct of HOC because, at all relevant times, HOC acted as an alter ego of Xcel.

82. Because HOC is the alter ego of Xcel, Xcel is jointly and severally liable or otherwise responsible for the amounts owed under the Money Judgment.

## COUNT IV

### Successor Liability

83. Plaintiff repeats, restates, and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

84. Xcel is jointly and severally liable for amounts owed pursuant to the Money Judgment because it is the successor in liability to HOH.

85. By way of the "oral license agreement," the exercise of domination and control over HOC, the failure to respect the corporate forms, acquisition by Xcel of the 'Halston' and 'Halston Heritage' labels from HOH and HIP, the transfer to Xcel of cash from HOC, and other facts alleged herein, Xcel actively incorporated into its own business the business of the Halston Companies.

86.     The active incorporation of the business of the Halston Companies HOH into the business of Xcel constitutes a de facto merger between Xcel and the Halston Companies.

87.     Because Xcel has merged with the Halston Companies, it is the successor in liability to HOH and HOC, and is jointly and severally or otherwise vicariously liable for the amounts owed under the Money Judgment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

(a) Awarding Plaintiff damages in an amount to be determined at trial but in no event less than $359,882.64;

(b) Setting aside the transfer to HHR of the 'Halston' and 'Halston Heritage' labels by HOH and HIP.

(c) Setting aside the transfer of funds from HOC to Xcel;

(d) Attachment and execution against all assets transferred from the Halston Companies to Xcel in connection with the aforementioned transactions;

(c) Awarding to Plaintiffs all reasonable costs related to this action;

(d) Awarding to Plaintiff its reasonable attorney's fees, pursuant to NY Debtor and Creditor Law § 276-a;

(e) Awarding to Plaintiff pre- and post-judgment interest; and

(f) Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial as to all issues so triable.

Dated: New York, New York  FELICELLO LAW P.C.
       August 31, 2021

By: */s/ Michael James Maloney*
Michael James Maloney
Rosanne E. Felicello
366 Madison Ave, 3rd FL
New York, NY 10017
Tel. (212) 584-7806
mmaloney@felicellolaw.com
rosanne@felicellolaw.com