UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMFORTEX COMPANY, LTD,

Plaintiff,

– *against* –

XCEL BRANDS, INC., H HERITAGE LICENSING, LLC *and* XCEL DESIGN GROUP, LLC,

Defendants.

**OPINION & ORDER**

21-cv-7326 (ER)

RAMOS, D.J.:

Comfortex Company, Ltd. ("Comfortex), a Chinese garment manufacturer, seeks to hold Xcel Brands ("Xcel"), H Heritage Licensing, and Xcel Design Group (together, "Defendants") liable for an unsatisfied judgment against non-parties Halston Operating Company, LLC, H Company IP, LLC and House of Halston, LLC (together, the "Halston Entities"). Comfortex alleges that Defendants used their domination and control over the Halston Entities to fraudulently drain their assets, leading to the Halston Entities' insolvency and resulting inability to pay Comfortex. Comfortex alleges causes of action for: (1) constructive fraudulent conveyance; (2) actual fraudulent conveyance; (3) alter ego liability; and (4) successor liability. Doc. 1. Before the Court are Comfortex's motion to exclude expert testimony, Doc. 44, and Defendants' motion[1] for summary judgment, Doc. 42. For the reasons set forth below, Comfortex's motion is GRANTED and Defendants' motion is DENIED.

[1] Defendants title their memorandum of law as a request for "partial summary judgment," *see Doc*. 48 at 1. However, Comfortex asserts four counts: (1) constructive fraudulent conveyance; (2) actual fraudulent conveyance; (3) alter ego liability; and (4) successor liability. Doc. 1. And Defendants challenge all four counts in their papers. *See, e.g.*, Doc. 48.

# I. BACKGROUND

## A. Factual Background

The following facts are undisputed except where otherwise noted.

### *1. The Parties and the Halston Entities*

Comfortex is a garment manufacturer based in Hong Kong. Doc. 1 ¶ 19.[2] Defendants are Delaware corporations with their principal place of business in New York. Doc. 1 ¶¶ 20–22. Together, the Halston Entities sold garments under the "Halston" and "Halston Heritage" trademarks. *See* Doc. 47-6 (Malka Tr.) at 21:18 to 21:20. Two of the three non-parties, Halston Operating Company and H Company IP, are wholly owned by the third non-party, the House of Halston LLC ("House of Halston"). Doc. 57 (Pl.'s Response to Defs.' Rule 56.1 Statement and Counter-Statement of Undisputed Material Facts) at 2.

Ben Malka was the CEO and equity owner of House of Halston. Doc. 47-6 at 24:18 to 24:19. He also served on the Xcel Board for which he received incentive compensation from Xcel, although the precise amount of compensation is not alleged. Doc. 57 at 2.

Comfortex asserts that Malka controlled the Halston Entities, which acted as a single enterprise. Doc. 57 at 2. Defendants dispute the characterization that Malka had full control over the Halston Entities, and note that other Halston Operating Company employees were involved in the Halston Entities' production process and worked with retailers. Doc. 63 at 29 (Defs.' Reply to Pl.s' Statement of Undisputed Facts).[3]

---

[2] The Court notes that in several instances, in the interests of justice, recourse was made to facts contained in the admissible evidence submitted by the parties even where both parties failed to include the relevant information in their respective Rule 56.1 submissions. *See Gittens-Bridges v. City of New York*, No. 22-810, 2023 WL 8825342, at *1 (2d Cir. Dec. 21, 2023) (noting that the district court, in its discretion, considered a motion for summary judgment on its merits in the interest of "fairness" to the plaintiff, even though the "profound procedural shortcomings in her summary-judgment submissions" were reason enough to grant defendant's motion for summary judgment).

[3] In this document, Defendants also reply to Comfortex's responses to Defendants' statement of facts. *See* Doc. 63. However, "Local Civil Rule 56.1 does not provide for a 'reply' in further support of a Rule 56.1 statement of undisputed facts." *Capital Records, LLC v. Vimeo, LLC*, No. 09-cv-10101 (RA), 2018 WL

*2. Xcel's Acquisition of the "H by Halston" and "H Halston" Brands*

On December 23, 2014, Xcel acquired, from one of the Halston Entities,[4] the "H by Halston" and "H Halston" brands. Doc. 49 (Defs.' Statement of Uncontested Material Facts) at 1. According to Comfortex, the "H by Halston" and "H Halston" brands are secondary lines of merchandise of the "Halston" and "Halston Heritage" trademarks. Doc. 1 ¶ 5. As consideration for these acquisitions, Xcel paid approximately $18 million dollars and 1 million shares of Xcel common stock. Doc. 49 at 1.

From 2014 until July 1, 2017, Xcel licensed the "H by Halston" and "H Halston" brands to two prominent retailers, Dillard's and the Hudson Bay Company ("Hudson Bay"). *Id*. at 1–2. During that time, Xcel provided design services for Dillard's and Hudson Bay, and in exchange was paid a royalty fee based on retail sales. *Id.* at 2.

In mid-2017, Xcel claims it entered into an oral agreement to license certain products from brands, including products under the "H Halston" brand, to the Halston Operating Company. *Id.* According to Xcel, the terms of the oral agreement were consistent with a draft license agreement between Xcel and the Halston Operating Company. *Id*. Pursuant to the draft licensing agreement, Xcel was to provide the Halston Operating Company with an "exclusive, non-transferable, non-assignable license" to source and manufacture, sell, and advertise products from the brands. *See* Doc. 47-4 (draft licensing agreement).[5] Xcel also agreed to provide "a reasonable number of

---

4659475, at *1 (S.D.N.Y. Sept. 10, 2018). "A Reply Rule 56.1 Statement is a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules." *Pape v. Dircksen & Talleyrand Inc*., No. 16-cv-5377, 2019 WL 1435882, at *3 (E.D.N.Y. Feb. 1, 2019), ), *R&R adopted*, 2019 WL 1441125 (E.D.N.Y. Mar. 31, 2019). Accordingly, the Court declines to consider the Reply Rule 56.1 Statement, except to the extent it responded to the new facts in Defendants' Counter Statement of Facts or the evidence cited is contained in the materials provided to the Court, which it has independently reviewed. *See id.*

[4] Defendants assert the seller was H Company IP, while Comfortex claims it was House of Halston, H Company IP's holding company. *See* Doc. 63 at 1.

[5] Specifically, the draft licensing agreement references "licensed products under the product category relating to the [t]rademarks as specified in Schedule A." Doc. 47-4 § 1.2. Schedule A consists of the "H Halston," "IMNYC" and "Highline Collective" trademarks. Doc. 47-4 at 1.

[d]esigns" on "a regular basis" as "reasonably requested" by the Halston Operating Company. Doc. 47-4 § 4.1. In exchange, the Halston Operating Company paid Xcel licensing fees based on the net wholesale of products under the brands as well as design fees. *See* Doc. 47-4 at 1 (Schedule A in the draft licensing agreement outlining licensing and design fees).[6]

Between January 30, 2018 and September 18, 2018, the Halston Operating Company paid Xcel over $1.5 million dollars in purported licensing and design fees. Doc. 57 at 9. Comfortex disputes the existence of the oral licensing agreement, claiming that the draft agreement was never properly executed. Doc. 57 at 7–8.

3. *Degree of Closeness between Xcel and the Halston Entities During the Oral Licensing Agreement*

During the course of the oral licensing agreement, Xcel was involved in negotiations with Chinese manufacturers over the price of production. Doc. 57 at 9. Seth Burroughs, Xcel's Executive Vice President, would travel to the Halston Operating Company's offices once every other month allegedly to "coordinate" the licensing agreement. *Id.* at 8. Additionally, the Halston Operating Company's employees Cynthia Allen, Tracey Powell, and Stephanie Lee—who initially worked at Xcel and then were directly hired by the Halston Operating Company— occupied desks in Xcel's offices and performed the same tasks as they did at Xcel. *Id.* at 6.

4. *The Sale of the "Halston" and "Halston Heritage" Trademarks to Xcel*

Comfortex alleges that sometime in July 2018, Burroughs reviewed the books and records of the Halston Entities and concluded that their liabilities exceeded the value of their assets—or in other words, that the Halston Entities were insolvent—with the exception of the value of the "Halston" and "Halston Heritage" trademarks. Doc. 57 at 9.

---

[6] There is evidence that the parties operated according to the terms of the draft licensing agreement. *See* Doc. 47-3 at 84 ¶¶ 14–20 (deposition transcript of Seth Burroughs, Xcel's Executive Vice President) ("My recollection is that the final license agreement was never signed between Xcel and Halston. We were operating under an agreement on a de facto basis [.]"); Doc. 56-6 (April 8, 2018 email chain between Seth Burroughs and Ben Malka discussing formally signing the Draft Licensing Agreement).

Defendants dispute that they knew the Halston Entities were insolvent in July 2018. Doc. 63 at 30.

On July 6, 2018, Xcel obtained an appraisal of the trademarks prepared by Consensus Securities LLC ("Consensus"). Doc. 57 at 15. By August 4, 2018, the Halston Entities owed the Bank of HaPoalim, an Israeli bank, approximately $5.5 million dollars. Doc. 49 at 3. On October 9, 2018, Xcel and the Halston Entities signed a letter of intent to transfer the "Halston" and "Halston Heritage" trademarks to Xcel for $11 million dollars. Doc. 57 at 18. Consensus provided a second appraisal of the trademarks to Xcel on November 18, 2018. Doc. 57 at 15.

In December 2018, the Xcel Board of Directors heard a presentation about potentially acquiring the "Halston" and "Halston Heritage" trademarks that were then owned by H Company IP. Doc. 49 at 3. At some time before January 2019, Xcel asked Consensus to prepare a fairness opinion to determine an appropriate purchase price for the "Halston" and "Halston Heritage" trademarks. *Id*. at 4. On January 23, 2019 Consensus presented its findings (the "Consensus Report"). *Id*. The Consensus Report provided a $17,170,000 low value estimation, $21,655,000 middle value estimation, and $29,088,000 high value estimation. *Id*. The Consensus Report also expressly referred to the July 6 and November 21, 2018 appraisals performed by Consensus. Doc. 41-2 at 3.

On February 11, 2019, H Company IP sold the "Halston" and "Halston Heritage" trademarks to Xcel in exchange for $8.35 million dollars in cash plus 777,778 shares of Xcel's common stock, subject to the terms of a separate pledge agreement. Doc. 49 at 4–5. Pursuant to the purchase agreement, Xcel and H Company IP agreed to certain indemnification provisions. Doc. 47-25 at 42–47. As partial collateral security for Xcel's indemnification obligations, H Company IP pledged both the 1 million shares of Xcel common stock it acquired in connection with the 2014 sale of the "H by Halston" and "H Halston" brands, as well as the 777,778 shares of stock it was supposed to acquire in connection to the 2019 sale of the trademarks (the "Pledge Agreement"). Doc. 49 at 4;

Doc. 47-27. After closing the deal, Xcel claims it paid approximately $6.9 million to the Bank of HaPoalim, to pay off the Halston Operating Company's debt. Doc. 49 at 5. On April 12, 2019, after the closing of the Halston" and "Halston Heritage" deal, Malka filed a report with the SEC disclosing that he personally acquired 1 million shares of Xcel stock. Doc. 56-14.

**B. Procedural Background**

1. *Comfortex's Litigation Against the Halston Entities*

Between 2017 and 2018, Comfortex manufactured and shipped garments pursuant to orders placed by the Halston Entities. Doc. 56-12 ¶¶ 20, 37–40; Doc. 56-13. By July 2018, the Halston Entities owed Comfortex an outstanding balance of $343,009.83. Doc. 57 at 18. In light of the Halston Entities' failure to pay, Comfortex ceased work for them, and on November 28, 2018, commenced an action against the Halston Entities in the United States District Court for the Central District of California. Doc. 56 ¶¶ 3–4; Doc. 57 at 19. The Halston Entities defaulted after the court denied their motion to dismiss. Doc. 56-1. The court entered a default judgment against the Halston Entities in the amount of $359,882.64 on May 14, 2020. Doc. 56-13 (the "Money Judgment").

Comfortex has been unable to collect the Money Judgment against the Halston Entities. During post-judgment discovery, Comfortex alleges that it learned that: (1) Xcel extracted over $1.5 million dollars in purported licensing and design fees from the Halston Entities; and (2) Xcel had transferred to itself the Halston Entities' most valuable assets– the "Halston" and "Halston Heritage" trademarks—for less than fair value. Doc. 57 at 9–10; Doc. 58 at 9.

*2. The Instant Litigation*

Comfortex filed this suit on August 31, 2021, seeking damages and to set aside the transfer of the "Halston" and "Halston Heritage" trademarks to Xcel and the payment of licensing and design fees to Xcel. Doc. 1. Defendants filed their answer on October 29, 2021. Doc. 21. Defendants filed the instant motion for summary judgment on March 3,

2023. Doc. 42. That same date, Comfortex filed its motion to exclude Andrew Jassin's expert report, which is explained in more detail below. Doc. 44.

*1. Andew Jassin's expert report*

On October 31, 2022, Xcel served an expert report prepared by Andrew Jassin. Doc. 45-4. Jassin is a Managing Director for a fashion industry consultancy and business advisory firm, and was asked to provide an expert opinion on "the elements of a [f]air [m]arket [v]aluation of a trademark and whether the Consensus Report included a fair market valuation of the "Halston" and "Halston Heritage" trademarks. *Id.* at 6.

In preparing his report, Jassin reviewed the complaint in this action, documents from the December 2018 presentation to the Xcel board of directors, the Consensus Report, "general published literature" concerning, among other things, valuations and trademarks, and public information about the "Halston" and "Halston Heritage" trademarks. *Id.* at 6, 13. Jassin did not review the July 6 and November 21, 2018 Consensus appraisals.

Jassin concluded that the Consensus Report did not provide a fair market valuation of the trademarks, *id.* at 9, because it "does not contain historical financial [*sic*] which I would have expected, describing why the company was not profitable, if its overhead was wrong or whether sales were not occurring at a predictable rate, and omits factors[.]" *Id.* Specifically, Jassin stated a fair market valuation would contain 14 different factors, as he defined them.[7] *Id.* at 8–9. According to Comfortex, the two Consensus appraisals, which Jassin did not consider, did include a recitation of the 14

[7] These factors include: (1) "[a] complete [i]nformation deck and up-to-date brand book with historic business information and current marketing / advertising and PR information"; (2) information about the Halston fragrance business; (3) consumer brand surveys describing "positioning [and] awareness"' (4) product pricing surveys; (5) industry financial comparisons, if available; (6) a description of the competition; (7) retail commentary and feedback on the brand; (8) historical reporting on prior licensing activities; (9) copies of each trademark/tradename registration; (10) a presentation on new licensing opportunities; (11) guidelines the company used to protect intellectual property; (12) information about e-commerce and social media activities; (13) articles of incorporation for the company; (14) the company's organizational chart. Doc. 45-4.

factors Jassin opines are necessary for a fair market valuation of a trademark. Doc. 60 at 5–6. Jassin also opined that the Consensus Report was not a fair market valuation because it was prepared for Xcel, a buyer, when "fair market valuations are created for the benefit of the seller not for the buyer." *See* Doc. 45-3 at 40:11–13.

Jassin's report does not include any financial estimates about the value of the trademarks. Indeed, at his January 13, 2023 deposition, Jassin acknowledged that he was not offering any opinion as to the fair market value of the "Halston" or "Halston Heritage" trademarks. Doc. 45-3 at 38:22. Rather, his report only considered whether the Consensus Report contained a fair market valuation. Doc. 45-3 at 38:22.[8]

## II. LEGAL STANDARDS

### *1. Motion to Exclude Expert Report Pursuant to Federal Rules of Evidence 403 and 702*

### *a. Federal Rule of Evidence 403*

Federal Rule of Evidence 403 ("Rule 403") permits the exclusion of evidence, even if relevant, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. The district court has broad discretion in making decisions under Rule 403's probative-prejudice balancing analysis, *Fiacco v. City of Rensselaer*, 783 F.2d 319, 327–28 (2d Cir.1986), and should consider "whether the evidence's proper value 'is more than matched by [the possibility] . . . that it will divert the jury from the facts which should control their verdict.'" *Bensen v. Am. Ultramar, Ltd.*, No. 92-cv-4420, 1996 WL 422262,

---

[8] Specifically, the deposition transcript states:

> Q: The scope of your assignment did not include rendering your own fair market valuation of those trademarks, right?
>
> Jassin: That was not my assignment, correct.
>
> Q: And nowhere in your report do you opine as this is the fair market valuation of these trademarks, right?
>
> Jassin: [. . . ] I do not opine on my valuation of the trademarks.

Doc. 45-3 at 38:14–39:2.

at *6 (S.D.N.Y. July 29, 1996) (quoting *United States v. Krulewitch*, 145 F.2d 76, 80 (2d Cir.1944)).

*b. Federal Rule of Evidence 702*

Federal Rule of Evidence 702 ("Rule 702)" governs the admissibility of expert testimony. Pursuant to this Rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

"As the Supreme Court explained in Daubert, Rule 702 requires the district court to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Ruggiero v. Warner-Lambert Co*., 424 F.3d 249, 253 (2d Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589 (1993)). In interpreting Rule 702, district courts, under Daubert, may consider the following non-exhaustive list of factors to determine whether evidence is sufficiently reliable: (1) whether a theory or technique had been and could be tested, (2) whether it had been subjected to peer review, (3) what its error rate was, and (4) whether scientific standards existed to govern the theory or technique's application or operation. *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). In *Kumho Tire Co. v. Carmichael*, the Supreme Court held that the trial judge's gatekeeping obligation applies not only to testimony based on "scientific" knowledge, as in *Daubert*, but also to testimony based on "technical" or "other specialized" knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

*2. Motion for Summary Judgment*

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might "affect the outcome of the litigation under the governing law."  *Id.* (quoting *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its

favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

For claims under New York law, the Court should determine how the New York Court of Appeals would decide them. *Reddington v. Staten Island Univ. Hosp*., 511 F.3d 126, 133 (2d Cir. 2007) (citation omitted). Decisions from New York's intermediate appellate courts are helpful indicators, but this Court is not bound by those decisions. *Id.* (internal quotation marks and citations omitted).

## III. DISCUSSION

### *1. Andrew Jassin's Testimony is Excluded*

Comfortex moves to exclude the Jassin expert report in its entirety. Comfortex argues that the report does not comply with Rule 702 because it fails to review relevant parts of the record—the July 6, 2018 and November 21, 2018 appraisals conducted by Consensus—and therefore lacks reliability. Doc. 60 at 6–10. The Defendants respond that Comfortex fails to show how not reviewing the appraisals would affect Jassin's application of his methodology to the Consensus Report. Doc. 55 at 11–12. Second, Comfortex argues that the report should be excluded under Rule 403 because it does not offer an opinion as to the value of the trademarks, and thus has no probative force. Doc. 60 at 10–13. The Defendants contend that the Jassin report is probative because, while the Consensus Report was presented to the Xcel Board of Directors, the July 6, 2018 and November 29, 2018 appraisals were not. Doc. 55 at 12–13. Accordingly, they argue Jassin's report demonstrates the Xcel Board of Directors' knowledge when making the decision to acquire the trademarks. *Id.* at 13.

Where "an expert opinion is based on data . . . [or] a methodology . . . that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (internal citation omitted); *see Ruggiero*, 424 at 253. In deciding whether an expert's opinion is unreliable, a district court must

"rigorous[ly]" examine the facts on which the expert relies, the expert's method, and how the expert applies the facts and methods. *Amorgianos*, 303 F.3d at 267. The district court should "only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id*.

Here, Jassin's conclusion that the Consensus Report does not include a fair market valuation of the "Halston" and "H by Halston" trademarks is based, in part, on the Report's failure to include a discussion of the 14 factors that Jassin contends are required to qualify as a fair market value report. Doc. 45-4 at 8–9. As Comfortex points out, the Consensus Report explicitly refers to and incorporates prior appraisals prepared by Consensus on July 6 and November 21, 2018. Doc. 60 at 7–8. It is undisputed that Jassin did not review the appraisals, both of which were produced in discovery and were available to the Defendants. *Id*.

The Defendants argue that Comfortex fails to explain why the July 6 and November 21, 2018 appraisals would affect Jassin's methodology.[9] *See* Doc. 55 at 11–12. But Comfortex notes that the appraisals include a recitation of the 14 factors Jassin opines are necessary for a fair market value report. Doc. 60 at 5–6. Defendants never dispute this point. In other words, Jassin did not review directly relevant parts of the record, which renders his opinion unreliable. *See*, *e.g.*, *Robinson v. Sanctuary Record Groups*, 542 F. Supp. 2d 284 (S.D.N.Y 2008) (finding expert's review lacked completeness where he was not given access to declarations and other documents that would have been relevant to his calculations) (vacated on other grounds); *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 379-381 (S.D.N.Y. 2014) (excluding an expert from opining on royalty records when the expert explicitly stated at his deposition that his report was based off incomplete data).

[9] In their reply, Defendants raise an additional argument that the July 6, 2018 and November 21, 2018 appraisals are impermissible hearsay. However, expert witnesses can rely on hearsay in reaching their opinions. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007).

Because Jassin did not review relevant parts of the record, the Court finds Jassin's expert report is based on data that is "simply inadequate to support the conclusions reached," such that Jassin lacks good grounds for his opinion that the Consensus Report is not a fair market value report. *See Amorgianos*, 303 F.3d at 266, 267. Therefore, the Court excludes Jassin's expert opinion pursuant to Rule 702. Additionally, because Jassin's expert report does not meet the requirements of Rule 702, the Court need not analyze whether it should also be excluded pursuant to Rule 403. *See Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 349 (S.D.N.Y. 2005) ("The Court will not, however, allow testimony that fails to satisfy the admissibility requirements of Fed. R. Evid. 702 and *Daubert* to be considered on summary judgment.").

*2. Defendants' Motion for Summary Judgment is Denied*

*a. Constructive Fraudulent Conveyance Claims*

Comfortex brings a claim for constructive fraudulent conveyance pursuant to the New York Debtor and Creditor Law[10] ("DCL") §§ 273, 273-a, 274, 275. To prevail on a constructive fraudulent conveyance claim pursuant to the DCL, a plaintiff must establish that the debtor conveyed the property to the transferee without fair consideration. DCL §§ 273, 273-a, 274, 275[11]; *see Sharp Int'l Corp. v. State St. Bank & Tr. Co.*, 403 F.3d 43

---

[10] Because the transfers at issue here occurred before December 6, 2019, the prior version of the DCL applies. *See* New York L. 2019, c. 580, § 7.

[11] DCL § 273 of the DCL states: "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debt. & Cred. Law § 273 (2018).

DCL § 273-a states: "[e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment." N.Y. Debt. & Cred. Law § 273-a (2018).

DCL § 274 states: "[e]very conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons

(2d Cir. 2005) ("a conveyance by a debtor is deemed constructively fraudulent if it is made without fair consideration and (inter alia) if one of the following conditions is met: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275.).[12]

As relevant to the applicable provisions of the DCL, "fair consideration" is defined by DCL § 272, which states:

> Fair consideration is given for property, or obligation:  (a) [w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or (b) [w]hen such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y. Debt. & Cred. Law § 272 (2018).  "[F]air consideration has two components—the exchange of fair value and good faith—and both are required."  *Atateks Foreign Trade Ltd. v. Dente*, No. 11-cv-01892 (ALC), 2017 WL 4221085, at *5 (S.D.N.Y. Sept. 22, 2017).  Courts have held that "fair consideration" must be determined "upon the facts and circumstances of each particular case."  *United States v. McCombs*, 30 F.3d 310, 326 (2d Cir. 1994).  "While fair consideration 'does not require dollar-for-dollar equivalence,' fair consideration cannot be 'disproportionately small . . . compared to the value of the

---

who become creditors during the continuance of such business or transaction without regard to his actual intent."  N.Y. Debt. & Cred. Law § 274 (2018).

DCL § 275 states:  "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."  N.Y. Debt. & Cred. Law § 275 (2018).

[12] At trial, Comfortex must also prove their fraud claims by a preponderance of the evidence.  *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 610 (S.D.N.Y. 2018), *aff'd sub nom. Tae H. Kim v. Ji Sung Yoo*, 776 F. App'x 16 (2d Cir. 2019).

transferred property.'" *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 611 (S.D.N.Y. 2018), *aff'd sub nom. Tae H. Kim v. Ji Sung Yoo*, 776 F. App'x 16 (2d Cir. 2019).

In other words, the inquiry of whether there was fair consideration is required for both transactions which Comfortex alleges are constructively fraudulent: (1) the payment of approximately $1.5 million dollars by the Halston Operating Company to Xcel, from January 1, 2018 and September 18, 2018, for licensing and design fees pursuant to an alleged oral trademark license agreement; and (2) the February 11, 2019 sale by H Company IP, LLC of the "Halston" and "Halston Heritage" trademarks to Defendants, in exchange for $8.35 million dollars in cash plus 777,778 shares of Xcel's common stock.[13] Each conveyance is addressed in turn.

*i. Licensing and Design Fees*

At bottom, the parties dispute the fair value of the licensing and design fees. Defendants argue that the $1.5 million dollar payment was properly made pursuant to an oral licensing agreement between the Halston Operating Company and Xcel. Doc. 49 at 2. Comfortex alleges that the $1.5 million dollars paid for licensing and design fees were not the fair value of those services. *See* Doc. 1 ¶ 68; Doc. 58 at 7. Although it does not specify what the proper value of these fees should be, Comfortex alleges that $1.5 million dollars paid in purported licensing and design fees was fraudulent. Specifically, it alleges that the draft licensing agreement was never properly executed, and the "existence of an 'oral license agreement' was fiction." Doc. 58 at 11. Instead, Comfortex claims the oral licensing agreement was merely a front for Xcel to extract the Halston Operating Company's free cash flow. Doc 57 at 9.

Defendants provide evidence that the fees were paid pursuant to an oral licensing agreement, the terms of which were consistent with a draft license agreement. *See* Malka Tr., 89:22-90:17; Doc. 47-3 at 84:3-7, Doc. 47-7 at 61:14-22. However, Defendants do

---

[13] The parties do not specify the value of these shares of Xcel common stock in their Rule 56.1 statements or in their papers.

not offer any evidence that the $1.5 million dollar payment was fair value for these services, which is the inquiry that DCL § 272 requires. N.Y. Debt. & Cred. Law § 272; *Atateks Foreign Trade Ltd.*, 2017 WL 4221085, at *5. Comfortex also does not provide evidence that specifically establishes the fair valuation of the licensing and design fees.

Accordingly, Defendants fail to satisfy their burden of establishing, as a matter of law, that there is an absence of a genuine material fact regarding the fair value of the licensing and design fees. *See Celotex Corp. v. Catrett*, 477 U.S. at 323. This dispute is material, since the lack of fair consideration is required for any constructive fraudulent conveyance claim pursuant to DCL §§ 273, 273-a, 274, and 275. *See Senno*, 812 F. Supp. 2d at 467.

Therefore, Defendants' motion for summary judgment on the fraudulent conveyance claims as to the licensing and design fees is denied.

*ii. Sale of the "Halston" and "Halston Heritage" Trademarks*

The parties also dispute the fair consideration for the "Halston" and "Halston Heritage" trademarks. Comfortex argues that reasonably equivalent value for these trademarks would be approximately $21 million dollars, due in part to the middle value stated in the Consensus Report. Doc. 1 ¶ 52, Doc. 58 at 16–17. Defendants argue that the price for the 2019 sale of the trademarks—for $8.35 million dollars plus 777,778 shares of Xcel's common stock—was fair consideration, stating that the Consensus Report reflected the value of the trademarks based on Xcel's ownership, and the value to Xcel, not necessarily the fair value of the trademarks.[14] Doc. 38 at 20.

Notably, Defendants do not offer any evidence establishing the fair value of the trademarks. The Andrew Jassin report is excluded, as explained above. But the Court notes that even if it considered the Jassin report, Defendants would not prevail. The report, as Jassin concedes, does not opine on the fair market value of the trademarks, but

---

[14] While Defendants object to the July 6, 2018 and November 21, 2018 Consensus appraisals as hearsay, they do not raise objections to the Consensus Report. Doc. 61 at 6.

rather states that the Consensus Report does not contain a fair market valuation.  Doc. 45-3 at 38:22.  Defendants also cite to testimony from Xcel's Executive Vice President, Seth Burroughs, but Burroughs's testimony also does not provide a fair market valuation of the trademarks.  *See* Doc. 47-3 at 153:2-16.  In contrast, Comfortex relies on the Consensus Report's valuations, which provided a $17,170,000 low value estimation, $21,655,000 middle value estimation, and $29,088,000 high value estimation.  Doc. 57 at 14.

Thus, Defendants fail to satisfy their burden of establishing, as a matter of law, that there is an absence of a genuine material fact regarding the fair value of the trademarks in question.  *See Celotex Corp. v. Catrett*, 477 U.S. at 323.  This dispute is material, since the lack of fair consideration is required for any constructive fraudulent conveyance claim pursuant to DCL §§ 273, 273-a, and 274.  *See* Senno, 812 F. Supp. 2d at 467.

Therefore, Defendants' motion for summary judgment on the fraudulent conveyance claims as to whether the 2019 sale of the trademarks was made with fair consideration is denied.

    *b.  Actual Fraudulent Conveyance Claims*

Comfortex also brings claims for actual fraudulent conveyance pursuant to DCL §276.  DCL §276 provides that:

> "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

N.Y. Debt. & Cred. Law § 276 (2018).  As opposed to DCL §§ 273, 273-a, 274, and 275, fair consideration is not required.  *See Sharp*, 403 F.3d at 56 ("Where actual intent to defraud is proven, the conveyance will be set aside regardless of the adequacy of the consideration given.").  Instead, "intent to defraud on the part of the transferor" must be shown.  *Id.*  Because proving "[a]ctual intent [under DCL § 276] is difficult to establish

through direct evidence . . . , the relevant intent may be inferred from the facts and circumstances surrounding the transfer." *S.E.C. v. Smith*, 646 Fed. Appx. 42, 45 (2d Cir. 2016) (summary order). Known as badges of fraud, these are facts and circumstances "so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *See Sharp*, 403 F.3d at 56. These badges of fraud include:

> (1) a close relationship between the parties to the conveyance; (2) inadequacy of consideration received; (3) retention of control of the property by the transferor; (4) suspicious timing of the conveyance after the debt was incurred; (5) the use of fictitious parties; and (6) information that the transferor was insolvent as a result of the conveyance.

*Scantek Med., Inc. v. Sabella*, 583 F. Supp. 2d 477, 497 (S.D.N.Y. 2008).[15]

Comfortex alleges that the first, second, third, fourth, and sixth factors show fraudulent intent. Doc. 58 at 28. With regard to the first factor, they allege that Xcel was an insider that dominated the Halston Entities through Xcel employees and through Malka, and that the alleged oral licensing agreement was a pretext to dominate the Halston Entities and strip them of their assets. *Id*. With respect to the second factor, they allege that Xcel did not pay adequate consideration for the licensing and design fees or for the "Halston" and "Halston Heritage" trademarks. *Id*. With respect to the third factor Comfortex claims that due to these transfers, the Halston Entities lost control of their cash flow and their intellectual property. With respect to the fourth factor, Comfortex argues that—due to the timing of the transfer of the licensing and design fees, as well as the sale of the trademarks—the Halston Entities "never obtain[ed] access to or control over the equity consideration they were supposed to receive." *Id*. And with respect to the sixth factor, Comfortex alleges that the Halston Entities were insolvent at the time of the transfer, a fact which "Xcel knew and exploited." *Id*.

[15] At trial, Comfortex must prove its actual fraudulent conveyance claims by clear and convincing evidence. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995).

In response, the gravamen of Defendants' claims is that Comfortex lacks evidentiary support.[16] Doc. 48 at 21–22. Specifically, they allege the licensing and design fees were paid pursuant to an oral contract—not so the Halston Operating Company could avoid paying Comfortex. *Id*. Defendants also dispute that they knew the Halston Entities were insolvent before they began exploring the potential of acquiring the trademarks in July 2018, and further dispute that Xcel dominated the Halston Entities. Doc. 63 at 28, 30.

The Second Circuit has found that "ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind." *Golden Budha Corp. v. Canadian Land Co. of America,* 931 F.2d 196, 201–202 (2d Cir.1991). Here, both parties raise a number of factual issues relating to the alleged "closeness" of the Halston Entities and Xcel; the adequacy of consideration, and whether Xcel knew that the Halston Operating Company was insolvent during the relevant time period. These issues are material, *see Senno*, 812 F. Supp. 2d at 467, since they affect the so-called "badges of fraud" used as evidence of actual fraudulent intent. *See Scantek Med.* 583 F. Supp at 477.

Accordingly, the Court will not grant Defendants motion for summary judgment as to the actual fraudulent conveyance claim.

*c. Alter Ego Liability*

Comfortex alleges that House of Halston, one of the Halston Entities, was the alter ego of Xcel, and thus the Defendants are liable for the Money Judgment. Doc. 58 at 29. Defendants dispute this claim, arguing that the control exerted by Xcel was consistent with the kind of control a trademark licensor is required to have to maintain its trademark rights. Doc. 48 at 24.

---

[16] Defendants also mistakenly reference the legal standard for common-law fraud under New York law, which is not at issue here. *See* Doc. 48 at 21–22 (nothing that "[t]he elements of fraud the Plaintiff must prove are 'representation of material fact, falsity, scienter, reasonable reliance, and damages.'"). The correct standards for actual fraudulent conveyance are those pursuant to DCL § 276, as described above.

"New York courts apply a presumption of separateness to corporations and are hesitant to disregard the corporate form." *Prescient Acquisition Grp., Inc. v. MJ Pub. Trust*, 2006 WL 2136293, at *4 (S.D.N.Y. July 31, 2006) (citing *DeJesus v. Sears, Roebuck & Co*., 87 F.3d 65, 70 (2d Cir. 1996)). To prove that the corporate veil should be pierced under New York law, a plaintiff must show: "(1) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (2) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co*., 122 F.3d 130, 134 (2d Cir. 1997)). Courts in New York consider the following factors in analyzing whether the corporate veil can be pierced because an alter ego relationship exists:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*In re Amaranth Nat. Gas Commodities Litig*., 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009), *aff'd*, 730 F.3d 170 (2d Cir. 2013).

The core of the parties' dispute is whether the kind of control that Xcel exerted over the House of Halston goes beyond what is normally provided for in a licensor's approval rights under a trademark licensing agreement. *See, e.g*., *Can't Stop Productions, Inc. v. Sixuvus, Ltd.* 295 F. Supp.3d 381, 396 (S.D.N.Y. 2018) (citing *Dawn Donut Co. v. Hart's Food Stores, Inc*., 267 F.2d 358, 367-68 (1959) (2d Cir. 1959)) ("a licensor must exercise a 'reasonable degree of supervision and control over licensees under the facts and circumstances of the particular case.'"). While Xcel claims its control of approval rights is not indicative of domination and control, Comfortex alleges that

Xcel's degree of control "went much further than routine policing of trademark usage." Doc. 58 at 30. Specifically, Comfortex alleges that Xcel disregarded corporate formalities with the Halston Entities by operating under the oral licensing agreement; had an overlap of personnel, such as Allen, Powell, Lee,[17] and Malka, shared office space through Allen, Powell, and Lee's continued use of Xcel office space after they were hired by the Halston Operating Company, and that the companies did not operate at arms-length, as demonstrated by the fact that Xcel did not pay fair consideration for the trademarks. *Id*.

Accordingly, a factual dispute exists on whether the kind of control Xcel asserted over the House of Halston was beyond the normal control a licensor retains pursuant to their approval rights under a trademark licensing agreement. This dispute is material, as it affects whether an alter ego relationship exists. *See Celotex Corp. v. Catrett*, 477 U.S. at 323.

Thus, the Court denies Defendants' motion for summary judgment to dismiss the theory of alter ego liability.

*d. Successor Liability*

Finally, Comfortex alleges that Defendants are liable for the Judgment under a theory that Defendants are the successors of the Halston Entities. Doc. 58 at 30–31. Defendants refute this allegation by claiming that no continuity of ownership existed between the Halston Entities, on the one hand, and Defendants, on the other, as required for successor liability. Doc. 48 at 25–26.

"To state a claim based on successor liability, a plaintiff must plead enough facts for the Court to infer that one of the exceptions to the general rule finding that a business entity acquiring the assets from another business generally results in no successor

[17] Specifically, Comfortex alleges that while Allen, Powell, and Lee were "nominal employees of [Halston Operating Company]" they "continued to ultimately report to Xcel." Doc. 57 at 6.

liability." *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 456 (S.D.N.Y. 2015) (internal citations and quotation marks omitted). The exceptions are: "(1) where the buyer expressly assumed the debt at issue; (2) where the transaction amounted to a fraud; (3) where the transaction constitutes a de facto merger; or (4) where the successor is a mere continuation of the predecessor." *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003) (citations omitted). Here, Comfortex posits that the third exception, de facto merger, applies. Doc. 58 at 30–31

"A de facto merger occurs when a transaction, although not in form a merger, is in substance "a consolidation or merger of seller and purchaser." *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003). The elements of a de facto merger under New York law include:

> (1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) a continuity of management, personnel, physical location, assets, and general business operation.

*Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 456 (S.D.N.Y. 2015). A party is not required to show each element. *Id*. "Although the court examines all of the foregoing factors, continuity of ownership is the essence of a merger, and the doctrine of de facto merger cannot apply in its absence." *Priestly v. Headminder, Inc.*, 647 F.3d 497, 505-06 (2d Cir. 2011) (per curiam) (internal quotation marks omitted). "Continuity of ownership exists where the shareholders of the predecessor corporation become direct or indirect shareholders of the successor corporation as the result of the successor's purchase of the predecessor's assets[.]" *See Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 150 A.D.3d 490 (1st Dept. 2017). Additionally, there "can be no continuity of ownership where the seller receives fair value consideration for its assets." *See id.* at 491.

First, Defendants argue that there are "no issues of fact" that the 2017 license of products to the Halston Operating Company in return for design and licensing fees, as well as the the February 11, 2019 sale of the "Halston" and "Halston Heritage" trademarks to Xcel, were made with fair consideration.  Doc. 61 at 14.  As explained above, the Court has found that material factual issues preclude summary judgment on the issue of fair consideration.

Next, the parties also dispute whether Malka's status as an equity shareholder in the Halston Entities and Xcel following the acquisition is sufficient to show continuity of ownership.  Comfortex points out that that immediately after the acquisition, Malka became an equity owner of both the Halston Entities and Xcel.  *See* Malka Tr. at 38:8–9 (explaining that as terms of his compensation at House of Halston, "[he] had some ownership"); Doc. 56-14 (April 12, 2019 SEC filing reporting Malka's acquisition of 1 million shares of Xcel stock).  Defendants contest this point, arguing that even though Malka was, temporally, "an equity owner of Xcel" after the acquisition occurred, there is no evidence to suggest that his "shares were acquired as a result" of the acquisition itself.  Doc. 61 at 15.  Additionally, because the Xcel stock in connection with the 2019 sale was subject to the Pledge Agreement, Defendants' argue that Malka could not hold an ownership interest in Xcel "as a result" of the 2019 sale.  *Id*.

"Continuity of ownership exists where the shareholders of the predecessor corporation become direct or indirect shareholders of the successor corporation as the result of the successor's purchase of the predecessor's assets."  *In re New York City Asbestos Litig*., 15 A.D.3d 254, 256 (N.Y. App. Div., 1st Dep't 2005).  "Stated otherwise, continuity of ownership describes a situation where the parties to the transaction become owners together of what formerly belonged to each."  *Id*.

Here, Comfortex provides evidence—and Xcel concedes—that Malka became an equity shareholder in Xcel after the acquisition.  And contrary to Xcel's assertion, continuity of ownership is not limited "to only those situations where the shareholder

interests are acquired in the same transaction as the asset sale." *Ambac*, 150 A.D.3d at 491. Instead, if the shares are acquired "as an element of the asset purchase transaction, continuity of ownership may exist." *Id.*; *see also Arnold Graphics Indus., Inc. v. Independent Agent Ctr., Inc.*, 775 F.2d 38, 42 (2d Cir.1985) ("[T]here is no requirement that all of the events that are necessary to a finding of de facto merger occur at the same time.").

Here, issues of fact exist as to whether Malka acquired the stock shares from Xcel "as an element" of Xcel's purchase of the "Halston" and "Halston Heritage" trademarks. The asset purchase agreement does not reference any acquisition of stocks by Malka. Docs. 47-25, 47-26. Nor is Malka referenced in the Pledge Agreement, which states "the execution and delivery of this Agreement by [H Company IP] is required[.]" Doc. 47-27 at 1. Because the Pledge Agreement does not apply to Malka as an individual, and only applies to H Company IP, Defendants' argument that the Pledge Agreement precludes Malka from having an ownership interest is Xcel is without merit.

Accordingly, the Court finds that Xcel has not met its burden for summary judgment as a matter of law. In other words, there is a genuine dispute over whether Malka's stock acquisition was an element of the purchase of the trademarks. Because this issue affects continuity of ownership—a required element of de facto merger—it is also material. *See Celotex Corp. v. Catrett*, 477 U.S. at 323.

Therefore, the Court denies Defendants' motion for summary judgment to dismiss the theory of successor liability.

## IV. CONCLUSION

For the reasons set forth above, Comfortex's motion to exclude Jassin's expert report is GRANTED and Defendants' motion for summary judgment is DENIED.

The parties are directed to appear at a pretrial conference on April 25, 2024, at 11:00 am by telephone. The parties are instructed to call (877) 411-9748 and enter access code 3029857# when prompted.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 42 and 44.

It is SO ORDERED.

Dated: March 25, 2024
New York, New York

EDGARDO RAMOS, U.S.D.J.